UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| MARLORITA BATTLE, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>A&E TELEVISION NETWORKS, LLC )<br>and WILD EYES PRODUCTIONS, )<br>INC., )<br>)<br>Defendants. ) | No. 3:11-0013<br>Judge Sharp |

## MEMORANDUM

This is a defamation action arising from the production and airing of a television program ("the Program") titled "Conspiracy." The Program was produced by Defendant Wild Eyes Productions, Inc. ("Wild Eyes") for the series, "The Squad: Prison Police," and aired by Defendant A&E Television Networks, LLC ("A&E"). In the Program, Plaintiff Marlorita Battle is unwittingly filmed while vising her husband at the Riverbend Maximum Security Institution ("Riverbend") in Nashville, Tennessee.

Plaintiff has filed an Amended Complaint in which she sets forth claims against Defendants for "defamation/false light" (Count I) and the intentional infliction of emotional distress (Count II).[1] Defendants now move to dismiss the Amended Complaint (Docket No. 25)[2], and that motion has

---

[1] Plaintiff's original Complaint contained a claim for defamation *per se*, but Plaintiff has moved to voluntarily dismiss that claim (Docket No. 18), and that request will be granted.

[2] Defendants also filed a Motion to Dismiss Plaintiff's original Complaint, a request that was rendered moot by the filing of the Amended Complaint. Nevertheless, since there is significant overlap in the briefing and the legal issues are the same in regard to Plaintiff's claims for "defamation/false light" and the intentional infliction of emotional distress, the Court has considered all of the arguments raised by the parties in their filings supporting and opposing the Motions to Dismiss.

1

been fully briefed by the parties. (Docket Nos. 13, 16, 26, 30, 33-1 & 35).

## I. STANDARD OF REVIEW

As a general rule, in considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must take "all well-pleaded material allegations of the pleadings" as true. Fritz v. Charter Township of Comstock, 592 F.3d 718, 722 (6th Cir. 2010). The factual allegations in the complaint "need to be sufficient to give notice to the defendant as to what claims are alleged, and the plaintiff must plead 'sufficient factual matter' to render the legal claim plausible, i.e., more than merely possible." Id. (quoting Ashcroft v. Iqbal, 129 S.Ct. 1937, 1949-50 (2009)). "'A legal conclusion couched as a factual allegation,'" however, "need not be accepted as true on a motion to dismiss, nor are recitations of the elements of a cause of action sufficient." Id. (quoting Hensley Mfg. v. ProPride, Inc., 579 F.3d 603, 609 (6th Cir. 2009) and Bell Atl. Corp. v. Twombly, 127 S.Ct. 1955, 1965 (2007)). Further, in determining whether a complaint sets forth a plausible claim, a court may consider not only the allegations, but "may also consider other materials that are integral to the complaint, are public records, or are otherwise appropriate for the taking of judicial notice." Ley v. Visteon Corp., 543 F.3d 801, 805 (6th Cir. 2008) (citation omitted).

## II. DISCUSSION

As noted, the Amended Complaint contains claims for defamation/false light, and the intentional infliction of emotional distress. The Court sets forth its analysis regarding the claims under separate sub-headings.

### A. Defamation/False Light – Count I

A claim for common law defamation may be based upon written (libel) or spoken (slander) words. Quality Auto Parts Co., Inc. v. Bluff City Buick Co., 876 S.W.2d 818, 820 (Tenn. 1994).

2

"The basis for an action for defamation, whether it be slander or libel, is that the defamation has resulted in an injury to the person's character and reputation." Id. To establish defamation, "Plaintiff must prove that (1) a party published a statement; (2) with knowledge that the statement was false and defaming to the other; or (3) with reckless disregard for the truth of the statement or with negligence in failing to ascertain the truth of the statement." Shamblin v. Martinez, ___ S.W.3d ___, ___, 2011 WL 1420896 at *3 (Tenn. Ct. App. April 13, 2011).

A claim for defamation often overlaps with a claim for false light invasion of privacy, but the Tennessee Supreme Court has determined that "the differences between the two torts warrant their separate recognition." West v. Media Gen'l Convergence, Inc., 53 S.W.3d 640, 645 (Tenn. 2001). To establish a claim for the false light invasion of privacy, a plaintiff must prove "that a defendant published a matter concerning the plaintiff, placing the plaintiff before the public in a false light which is highly offensive to a reasonable person, and the defendant had knowledge that his statement was false or acted recklessly with regard to the falsity of the publicized statement." Gard v. Harris, 2010 WL 844810 (Tenn. Ct. App. 2010) (citing, West, 53 S.W.3d at 643-44)).

Although "the common law has afforded a cause of action for damage to a person's reputation by the publication of false and defamatory statements" since at least "the latter half of the 16th century," Micovich v. Lorain Journal Co., 497 U.S. 1, 11 (1990), the Supreme Court has imposed certain constitutional limits on state law defamation claims because the First Amendment protects society's interest in "uninhibited, robust, and wide-open debate," and "[w]hatever is added to the field of libel [and slander] is taken from the field of free debate.'" New York Times Co. v. Sullivan, 376 U.S. 254, 270 & 272 (1964). Such limitations were summarized by the Supreme Court as follows:

3

> One can discern in these [Supreme Court] decisions two forces that may reshape the common-law landscape to conform to the First Amendment. The first is whether the plaintiff is a public official or figure, or is instead a private figure. The second is whether the speech at issue is of public concern. When the speech is of public concern and the plaintiff is a public official or public figure, the Constitution clearly requires the plaintiff to surmount a much higher barrier before recovering damages from a media defendant than is raised by the common law. When the speech is of public concern but the plaintiff is a private figure, . . . the Constitution still supplants the standards of the common law, but the constitutional requirements are, in at least some of their range, less forbidding than when the plaintiff is a public figure and the speech is of public concern. When the speech is of exclusively private concern and the plaintiff is a private figure, . . . the constitutional requirements do not necessarily force any change in at least some of the features of the common-law landscape.

Philadelphia Newspapers, Inc. v. Hepps, 474 U.S. 767, 775 (1986) (internal citations omitted).

In her filings, Plaintiff spends some time arguing that she is a private figure and that the subject of the Program did not involve a matter of public concern. In response to those arguments, Defendants assert those issues are not relevant at this time. (Docket No. 26 at 10). Instead, Defendants argue that they "have asked that the Court dismiss this case based on a single issue of law, and that is that the Documentary Program is not capable of a defamatory meaning." (Id. at 9-10).

In Tennessee, the issue of whether a statement is *capable* of a defamatory meaning is a question of law to be decided by the court. Memphis Publ'g Co. v. Nichols, 569 S.W.2d 412, 419 (Tenn. 1978) (citations omitted). If the court determines that the statement or communication is not defamatory, then dismissal of the action is appropriate; otherwise, it is for the jury to determine whether the statement was understood by its intended audience to be defamatory. See, id.; Forsman v. Rouse, 2008 WL 2437644 at * 3 (M.D. Tenn. 2008).

In determining whether a statement is capable of a defamatory meaning, the "[a]llegedly defamatory statements should be judged within the context in which they are made," and given their

4

usual meaning, "as a person of ordinary intelligence would understand them in light of the surrounding circumstances." Revis v. McClean, 31 S.W.3d 250, 253 (Tenn. Ct. App. 2000).

Typically, "'[i]t is a relatively simple, straightforward task for a plaintiff to identify with absolute precision the exact words that are alleged to be defamatory.'" West v. Media Gen. Operations, Inc., 120 Fed Appx. 601, 615 (6th Cir. 2005) (quoting, West v. Media Gen. Operations, Inc., 250 F.Supp.2d at 923, 932 (E.D. Tenn. 2001)). "'However, in cases involving television broadcasts with a stream of audio and visual components interacting with each other, the plaintiff's burden of identifying allegedly defamatory words with absolute precision and exactitude is much more complicated and poses an especially difficult problem.'" Id. In an analysis with which the Sixth Circuit agreed, the district court in West explained the difficulties inherent in establishing defamation in cases involving television programs, writing:

> . . . [T]elevision programs are divided into a number of video and audio segments. In some segments, the audio and video are of the same event such as when a person makes a remark or statement on camera. In other segments, the audio may be a "voice-over" to a different video or photograph. "It is the juxtaposition of these varying segments into an audio and video mosaic that conveys the meaning or meanings intended." . . . In reviewing a television broadcast for possible defamatory statements, a court and jury cannot confine their analysis to the words alone. The court and jury are necessarily required to also consider the impact of the video portion of the program since the television medium offers the publisher the opportunity, through visual presentation, to emphasize and convey ideas in ways that cannot be ascertained from a mere reading of the words in a written transcript.
>
>      \*        \*        \*
>
> . . . Although it is important, as in any defamation case, to focus on the words and language published by the defendant, this should not be the only focal point to the exclusion of other relevant facts and details. The words must be viewed in their proper context in juxtaposition to all of the audio and visual components of the television broadcasts as a whole. The defendant's defamatory words, standing alone, cannot readily be identified in isolation without also considering the accompanying visual images, the tone of voice of the announcer or reporter, along with the combined audio and video editing effects. If words are taken completely out of the

5

> context of the audio and visual components of the television broadcasts as a whole, then it would not constitute a satisfactorily accurate, effective method for identifying televised statements and visual images which are alleged to have a combined defamatory meaning.

Id. at 615 (quoting, West, 250 F.Supp.2d at 932-34) (internal citation omitted).

Even though this matter is before the Court on a Motion to Dismiss, the parties agree that the Court should independently review the Program in its entirety to determine whether it is capable of a defamatory meaning.[3] They also agree that the Court is not bound by the characterizations placed upon the Program by the parties. See, Stones River Motors, Inc. v. Mid-South Publ'g Co., 615 S.W.2d 713, 719 (Tenn. Ct. App. 1983) ("In determining whether the published words are reasonably capable of such a meaning, the courts must look to the words themselves and are not bound by the plaintiff's interpretation of them."). That independent review shows the following:

The 25-minute Program is titled "Conspiracy," with roughly the first third of the Program involving allegations that Plaintiff may have conspired with her husband to bring drugs into Riverbend. It begins with the written statement: "The following shows real people facing criminal charges. They are presumed innocent until proven guilty." After a notation that the show contains graphic material, a Tennessee Department of Corrections Special Agent (later identified as John Fisher) appears on screen and says, "I think we got her . . . inmates have found a weakness in our security." This is followed by still shots of what appears to be marijuana, cocaine and crack.

The screen next indicates that it is "Saturday, September 12," and shows a panoramic view of the imposing, castle-like fortress of the "Tennessee Prison."[4] Next, the screen indicates it is 2:09

---

[3] At the parties' request, the Court has agreed to take judicial notice of the contents of the Program. (Docket No. 37).

[4] This actually is a picture of the old Tennessee State Prison, which has been closed for many years.

6

at the "Visitation Center" and, against various shots of Riverbend, Agent Fisher states that "we definitely have a breach in our security with the influx of drugs coming into the institution. . . . we have received information from a confidential informant that an inmate's wife has been bringing drugs into the institution on a regular basis." Shortly thereafter, Agent Fisher says, "we're expecting this lady today," at which point a picture of Plaintiff's face appears on the screen.[5]

The screen next indicates it is 2:35 in the "Situation Control Room," and Agent Fisher is shown operating a joystick which controls the cameras in the visitation area. Agent Fisher focuses the camera on Plaintiff and observes, "yea, that's her right here." As Plaintiff's husband approaches her and their toddler child, Agent Fisher states, "we've identified the female subject and inmate," and this is followed by a mugshot of Plaintiff's husband. Agent Fisher then appears on the screen and states, "these things typically happen early on in the visitation when everyone is busy." The segment then shows Plaintiff and her husband sitting next to each other, with their child in the husband's lap. The husband stands, places the toddler in a chair, and Agent Fisher observes that it "don't look like its been done yet, so now its just a waiting game."

The Program next provides basic background about the problem of drugs in prison. Officers are shown searching areas in the prison, and inmates are shown discussing the ready availability of drugs.

Filming then shifts back to the visiting area, where Agent Fisher is shown, once again, utilizing the joystick to focus the camera on Plaintiff and her husband. Initially, the couple embraces, and they are then shown walking side-by-side. The camera zooms to the Plaintiff's lower

---

[5] The picture has now been identified as coming from Plaintiff's driver's license. However, the source of the picture is not identified in the Program, and it could easily be viewed by a layperson as a mugshot of plaintiff.

7

Case 3:11-cv-00013 Document 40 Filed 07/27/11 Page 7 of 15 PageID #: 347

back. Plaintiff's husband's hand is moving around the waist band of Plaintiff's pants, at which point Agent Fisher mutters, "uhm." Plaintiff then walks away from her husband and towards the bathroom, which prompts Agent Fischer to state, "hold on now, she's going to the bathroom. Typically, these women hide stuff up in their vaginal cavity and then go to the restroom to take it out. Now we are starting to get to the nitty gritty."

The next scene is a picture of the bathroom doors in the visiting area. When Plaintiff exits from the bathroom within what appears to be seconds after her entry, Agent Fisher says, "there she is right there. See how fast she went in there. She didn't have time to pee. She went in and came right back out." Agent Fisher focuses the camera on Plaintiff who is sitting next to her husband and holding something in her hand. The couple then begin kissing, and while they do so, a noise, sounding like a cymbal clashing, is played in the background. The couple kiss again for a longer period of time while cymbal-like noises are again played in the background. Agent Fisher states "some **** just happened. I think we got 'em, I think we got them." Agent Foster rapidly walks to a window overlooking the visiting room where Plaintiff's husband is shown being escorted out by a correctional officer. The written statement "a strip-search of the suspect did not reveal any smuggled drugs" is flashed upon the screen, and then Plaintiff's husband is shown being taken to a "dry cell"[6] for observation.

The Program then skips to the following day. Plaintiff's husband is released after being in the "dry cell" after twenty-four hours, during which time, he passed no contraband. Agent Fisher opines, it was a "false alarm."

---

[6]As the name suggests, a "dry cell" has no running water, and it is expected that if an inmate swallows any contraband, the same will be passed while the inmate is in the "dry cell."

The remainder of the Program focuses on the search for contraband in the prison, and the allegation that a correctional officer has been introducing drugs and cellphones into the prison. After a sting operation, the officer is arrested at a nearby shopping plaza. During the end credits, Agent Fisher observes, "if you are dirty, if you are smuggling in contraband, drugs, cellphones, tobacco, then we're going to catch you. We might not get you today, maybe next week, next month, next year, but eventually, we're going to catch up with you , and we're gonna get you. That's what we do."

Defendants assert that dismissal is required because the Program "does not communicate the 'meaning that the Plaintiff attempts to place on it,'" in that the Program "does not state that a crime was determined by the State Prison special police force to have been committed during Plaintiff's visit to her husband." (Docket No. 13 at 9, emphasis in original). Instead, according to Defendants, the Program "accurately reports the result of an investigation, which was that public officials suspected that Plaintiff might be smuggling drugs, that her observed behavior and information received by those state officers led to further investigative efforts, and that drugs were not found on that visit." (Id., emphasis in original).

"A trial court is permitted to determine that a statement is not defamatory as a matter of law . . . only when it can say that the statement is not reasonably capable of any defamatory meaning and cannot be reasonably understood in any defamatory sense." Biltcliffe v. Hailey's Harbor, Inc., 2005 WL 2860164 at **4 (Tenn. Ct. App. Oct. 27, 2005). Having reviewed the Program in its entirety, the Court finds that it is, in fact, capable of a defamatory meaning and could be viewed by a reasonable jury as holding Plaintiff in a false light.

The clear implication from the opening is that the show is about a conspiracy to bring drugs

9

into Riverbend. This begins with Agent Fisher's observation that officers are onto an inmate's wife who is supposedly bringing drugs into the prison. The focus of the first third of the program is almost entirely on Plaintiff and her interactions with her husband. She is specifically identified as the one who is thought to be bringing drugs to her husband.[7] From the display of such things as the husband's hands moving around Plaintiff's waistband, to Plaintiff's exit from the bathroom within seconds of entering, to the couple kissing, a reasonable jury could draw the impression that Plaintiff has brought drugs into the prison in an effort to pass them to her husband. This plausible impression is only solidified by Agent Fisher's comments about how drugs are usually secreted in a body cavity where they are retrieved in the restroom, the display of kissing while ominous sounds are played in the background, and Agent Fisher's statement that "some **** just happened," and "I think we got them." Even though the Program indicates that a search of Plaintiff revealed no drugs, a jury could conclude from the overall way that the Program is presented that Plaintiff was a drug smuggler who just happened not to get caught on September 12, 2009. Such an impression is enforced by Agent Fisher's parting comments to the effect that while we might not get you today, we will get you sooner or later if you are smuggling drugs into a Tennessee prison.

Despite claiming that the only legal issue before the Court at this time is whether the Program is capable of a defamatory meaning, Defendants argue that, under Tennessee law, a publication need only be substantially true to defeat a defamation claim, and where a speaker can only be understood as expressing an opinion, theory or interpretation, the statement is not actionable. (Id. at 11 & 12, citing, Stones River Motors, 651 S.W.2d at 719 and Haynes v. Alfred A. Knopf,

---

[7] While Plaintiff is never identified by name in the Program, "[s]tatements that do not specifically name a plaintiff are capable of a defamatory meaning if the plaintiff establishes extrinsic facts to show that the statement was made 'of and concerning' the plaintiff. Steele v. Ritz, 2009 WL 4825183 at *3 n.5 (Tenn. Ct. App. Dec. 16, 2009). Clearly the person pictured in the driver's license and on screen is Plaintiff.

10

Inc., 8 F.3d 1222, 1227 (7th Cir. 1993)). For any of a number of reasons, such arguments are not for the Court to decide at this juncture and on this limited record.

First, whether a statement is true or not is generally a matter for the jury. As has been explained by the Tennessee Court of Appeals:

> The respective roles of the trial court and jury in defamation proceedings are essentially the same as they are in other civil cases. Thus questions regarding (a) whether the defendant communicated a statement regarding the plaintiff to a third person, (b) whether the statement is true or false, and (c) whether the defendant had the requite fault are normally questions of fact for the jury. However, as in other civil proceedings, trial courts may direct verdicts either for or against defamation claims if the evidence regarding the claim is so overwhelmingly one-sided that it would permit a reasonable fact-finder to reach only one conclusion.
> Despite the similarities between defamation proceedings and other proceedings, trial courts in defamation proceedings possess one additional adjudicatory prerogative that they do not possess in other civil cases. They have the independent authority to determine, based on all the facts, (a) whether the communication at issue is reasonably capable of conveying the particular meaning or innuendo ascribed to it by the plaintiff and (b) whether that meaning is defamatory in character.

Biltcliffe, 2005 WL 2860164 at ** 3-5. Moreover, "[w]ords which are substantially true can nevertheless convey a false meaning whether intended by the speaker or not." Pate v. Service Merchandise, Inc. 959 S.W.2d 569, 574 (Tenn. Ct. App. 1996). "The proper question is whether the meaning reasonably conveyed by the published words is reasonably understood in a defamatory sense by the reader or listener," id., and the Court finds that the Program is capable of a defamatory meaning and placing Plaintiff in a false light.

Second, "[t]he United States Supreme Court and Tennessee courts have recognized that opinions are not automatically protected by the United States Constitution." Malmquist v. Hearst Corp., 1247800 at *3 (W.D. Tenn. 2010) (citing, Milkovich v. Lorain Journal Co., 497 U.S. 1; Revis v. McClean, 31 S.W.3d 250, (Tenn. Ct. App. 2000)). After all, "expressions of 'opinion' may often

11

imply an assertion of objective fact":

> If a speaker says, "In my opinion John Jones is a liar," he implies a knowledge of facts which lead to the conclusion that Jones told an untruth. Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar."

Milkovich, 497 U.S. at 18-19. Thus, even if Agent Fisher's various statements are said to be mere opinions, the Court is not in any position to determine whether such opinions are erroneous, incorrect or incomplete.

Third, and perhaps most importantly, Defendants argue as if the Program was a realtime reporting of events as they happened, when, in fact, it is clear from a review that the Program was highly edited. The difference between live reporting and the airing of canned episodes can be important because "defamation may be proven by establishing that a party published a false and defaming statement with reckless disregard for the truth or with negligence in failing to ascertain the truth." Sullivan v. Baptist Mem. Hosp., 955 S.W.2d 569, 575 (Tenn. 1999). "The appropriate question to be determined from a preponderance of the evidence is whether [Defendants] exercised reasonable care and caution in checking on the truth or falsity and the defamatory character of the communication before publishing it," Woodruff v. Ohman, 166 Fed. Appx. 212, 216 (6th Cir. 2006) (citation omitted), and that is something which cannot be determined merely by looking at the pleadings, or reviewing a copy of the Program.

In sum, when the court is called upon to determine whether a statement is capable of carrying a defamatory meaning, "[t]he court does not decide whether a statement was actually defamatory, but only whether a reasonable fact-finder could interpret it as containing false assertions of fact."

12

Ogle v. Hocker, 279 Fed.Appx. 391, 397 (6th Cir. 2008) (citing, Masson v. New Yorker Magazine, Inc., 501 U.S. 496, 516 (1991)). Because the Court finds that a reasonable jury could conclude that the Program leveled false and defamatory accusations against Plaintiff, Defendants request to dismiss Plaintiff's defamation/false light claim will be denied.

**B. Intentional Infliction of Emotional Distress – Count II**

In her Amended Complaint, Plaintiff alleges that Defendants' actions in filming and airing the Program constituted the intentional infliction of emotional distress. Specifically, Plaintiff alleges in Count II:

> 50. Defendants intentionally and deliberately inflicted emotional distress on Plaintiff by exposing Plaintiff's private affairs to the public at large and by making false statements about Plaintiff to the public at large.
>
> 51. Defendants knew or should have known that emotional distress was the likely result of their conduct.
>
> 52. Defendants' conduct was extreme and outrageous, beyond all possible bounds of decency and utterly intolerable in a civilized community.
>
> 53. The actions of the Defendants were the cause of Plaintiff's distress.
>
> 54. The emotional distress sustained by Plaintiff was severe and of a nature that no reasonable person could be expected to endure.
>
> 55. As a result of the Defendants' extreme and outrageous conduct, Plaintiff was, is, and with a high degree of likelihood, will continue to be emotionally distressed due to the intentional acts of Defendants, suffering from mental pain and anguish, severe emotional trauma, embarrassment, and humiliation.

(Docket No. 28 at ¶¶ 50-55). In response to Defendants' Motion to Dismiss, Plaintiff makes no cogent arguments, nor cites any persuasive authority which supports her intentional infliction of emotional distress claim.

The Court has read Plaintiff's Amended Complaint, and agrees with Defendants that Plaintiff's allegations are little more than a listing of the elements of a cause of action for the

13

intentional infliction of emotional distress. "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, . . . . ,a plaintiff's obligation to provide the 'grounds' of h[er] 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of a cause of action's elements will not do." Twombly, 550 U.S. at 555 (citation omitted). Yet, even if the claim is sufficiently plead by virtue of Plaintiff's allegation that she was "contacted by multiple family members and acquaintances inquiring why Plaintiff was appearing on an episode of 'The Squad . . . Conspiracy' as a drug dealer," and even if she subsequently endured "severe emotional trauma, mental anguish, stress, humiliation and damage" (Id. at ¶¶ 39-40), her claim for the intentional infliction of emotional distress fails as a matter of law.

Since the tort was first recognized in Tennessee in Medlin v. Allied Inv. Co., 398 S.W.2d 270, 274 (1966), the Tennessee Supreme Court has determined that claims for the intentional infliction of emotional distress are viable only upon a showing of truly outrageous and intolerable conduct. Miller v. Willbanks, 8 S.W.3d 607, 614 (Tenn.1999). "Although no perfect legal standard exists for determining whether particular conduct is so intolerable as to be tortious," the Tennessee Supreme Court "has adopted and applied the high threshold standard described in the Restatement (Second) of Torts":

> The cases thus far decided have found liability only where the defendant's conduct has been extreme and outrageous. It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort. Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community. Generally, the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous.'

14

Bain v. Wells, 976 S.W.2d 618, 622 (Tenn. 1997) (quoting, RESTATEMENT (SECOND) OF TORTS § 46 comment d (1965)). "[I]t is the court's duty in the first instance to apply that standard and determine 'whether the defendant's conduct may reasonably be regarded as so extreme and outrageous as to permit recovery[.]'" Id. (quoting, Medlin, 398 S.W.2d at 274.

Plaintiff's intentional infliction of emotional distress claim hinges on the Program's purported portrayal of her as a drug dealer. However, even if some of Plaintiff's family and friends viewed the Program in that light, Defendants' action in producing and airing the program is not something "beyond all bounds of decency," and "utterly intolerable in a civilized community," because the Program could also be understood as suggesting that the allegations that Plaintiff was bringing drugs into Riverbend was proven to be false. Accordingly, the Court finds, as a matter of law, that Plaintiff's allegations, even accepted as true, would not lead an average person to exclaim that Defendants' actions in producing and airing the Program were outrageous.

### III. CONCLUSION

On the basis of the foregoing, Plaintiff's Motion for Voluntary Dismissal of Count II (Docket No. 18) will be granted and her claim for defamation *per se* will be dismissed. Defendants' Motion to Dismiss Plaintiff's Amended Complaint (Docket No. 25) will be granted with respect to Plaintiff's claim for the intentional infliction of emotional distress, but denied with respect her defamation/false light claim. Finally, Defendants' Motion to Dismiss Plaintiff's original Complaint (Docket No. 12) will be denied as moot.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE

15